In re THREE PARTNERS, INC., Debtor.

Steven WEISS, Trustee, Plaintiff,

v.

PEOPLE SAVINGS BANK, Defendant.

Bankruptcy No. 91–41415–hjb.
Adv. No. 94–4275.

United States Bankruptcy Court,
District of Massachusetts.

Sept. 29, 1995.

Steven Weiss, Trustee.

John J. Driscoll, Holyoke, MA, for People Sav. Bank.

## MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

Before the Court for determination is a Motion for Partial Summary Judgment filed by the Trustee in Bankruptcy, Steven Weiss (the "Trustee") against the defendant, People Savings Bank (the "Defendant" or "Bank") on Count I of the Complaint and on the Bank's counterclaim. Through his Complaint, the Trustee seeks recovery of unauthorized post-petition transfers made to the Bank, pursuant to 11 U.S.C. § 549.

## I. BACKGROUND

The following material facts are not disputed.

On or around November 12, 1987, Three Partners, Inc. (the "Debtor") delivered to the Bank a promissory note in the original principal amount of $300,000 (the "Note") for the purpose of purchasing a restaurant facility in Westfield, Massachusetts, known as Burgundy's Restaurant (the "Restaurant"). The Debtor was a co-maker on the Note with 287 North Elm Street Trust (the "Trust"), John J. Symasko, Roddy Cameron, Jr. and Edwin L. Newalu. As security for the Note, the Debtor granted to the Bank a blanket security interest in all of the Debtor's assets. Under the terms of the Note, the makers were obligated to make payments of $1,667.67 per month plus interest.

Contemporaneously with the foregoing financing transaction, the Trust purchased a building located at 287 North Elm Street, Westfield, Massachusetts (the "Property") in which the Debtor operated the Restaurant. As further collateral for its obligations under the Note, the Trust granted to the Bank a first mortgage on the Property and a Collateral Assignment of Leases and Rents (the "Collateral Assignment"). The Debtor executed a lease on the Property in favor of the Trust. The lease provided for payments by the Debtor to the Trust in the approximate amount of $4,750 per month.

Approximately two years later, on January 23, 1990, the Trust executed and delivered to the Bank a second note in the amount of $30,000 (the "Trust Note").[1] The Debtor executed an unlimited guaranty on the Trust Note.

Not long after the foregoing transactions, the Debtor encountered financial difficulties. On April 24, 1991, the Internal Revenue Service recorded liens against the Debtor in the approximate amount of $31,821.61 with respect to tax assessments made on December 24, 1990 and March 4, 1991.[2] Consequently, the Debtor's president, Edwin Newalu, notified the Bank in late May, 1991 that the Debtor would be filing a petition in this court to prevent the Internal Revenue Service from seizing the Debtor's assets. In response, on May 31, 1991, the Bank notified the Trust that the Bank was exercising its rights under the Collateral Assignment, and that all rents received from the Debtor thereafter should be paid by the Trust to the Bank. Other than this letter, the Bank took no action to enforce its Collateral Assignment. Specifically, it made no technical or actual entry upon the Property, and did not take any actions to exercise dominion over the Property. Under the terms of the Collateral Assignment, the Trust authorized the Bank, upon default, to "enter upon the mortgaged premises and to collect, in the name of the owner ... the rents accrued but unpaid

1. The Trustee alleges that the proceeds of the Trust Note were intended to be used to pay off a second mortgage on the Property. There is no indication, however, as to whether the Trust Note was secured by a mortgage on the Property.

2. The Trustee filed a supplemental affidavit on March 10, 1995, which includes a copy of an amended proof of claim filed by the Internal Revenue Service on August 3, 1994. The proof of claim indicates that the Internal Revenue Service has a secured claim in the amount of $31,-821.61 as a result of two (2) tax liens filed on April 24, 1991 (based on unpaid taxes assessed on December 24, 1990 and March 4, 1991).

and in arrears ... as well as the rents thereafter accruing and becoming payable[.]"

On June 4, 1991, the Debtor filed a petition[3] in this court under Chapter 11 of the Bankruptcy Code. The Debtor operated the restaurant as a debtor-in-possession from the commencement of the case in June of 1991 until April 22, 1994. At no time during the pendency of the case did the Debtor seek authorization from the Court to make any payments to the Bank or to cash collateral pursuant to 11 U.S.C. § 363(c)(2). Nor did the Bank file a motion seeking adequate protection or a motion to prohibit the use of cash collateral. Nevertheless, during the period of June 4, 1991 (the date of the filing) through March 31, 1994, the Debtor made payments to the Bank in the approximate aggregate amount of $80,873.39. Additionally, the Bank received payments from the Debtor in the aggregate amount of $21,-455.84 which were ultimately applied to an escrow account for payment of real estate taxes.[4] It is undisputed that, during the pendency of the Chapter 11, the Debtor characterized its payments to the Bank as "rent" in profit and loss statements filed with the United States Trustee.

On April 29, 1992, this Court entered an order converting the case to Chapter 7. Steven Weiss was appointed as the Trustee in Bankruptcy and shortly thereafter, the Trustee closed the Debtor's business and took steps to recover available assets. The Trustee recovered approximately $15,242.59 from the collection and liquidation of the Debtor's inventory, prepetition and postpetition accounts receivable. After payment of administrative claims, and with accrued interest, the Trustee was holding the sum of $11,598.86, as of December 1, 1994.

On August 8, 1994, the Trustee filed the instant Complaint. The Bank responded with an answer as well as a counterclaim in which it alleges that the Trustee is currently holding assets which are encumbered by the Bank's lien (the aforesaid proceeds of the Trustee's asset liquidation), and the estate has no equity in those assets still held by the Trustee.[5] The Trustee filed the Motion for Partial Summary Judgment on Count I of the Complaint and on the Bank's counterclaim.[6] After a hearing, the Court took the matter under advisement.

## II. ARGUMENTS OF THE PARTIES

### A. Trustee's Argument

The thrust of the Trustee's argument is that the payments made by the Debtor to the Bank after the commencement of the case, on both the Note and the Trust Note, constituted transfers voidable, pursuant to 11 U.S.C. § 549. With respect to payments made to the Bank out of the proceeds of the Bank's prepetition collateral, the Trustee asserts that there was no court authorization to use cash collateral and no evidence that the IRS, a lienholder, consented to its use for the purposes of satisfying § 363(c)(2)(B). With respect to payments made to the Bank from the Debtor's assets acquired postpetition, the Trustee asserts that, pursuant to 11 U.S.C. § 552(a), the Bank's lien did not attach to such assets as no postpetition lien was granted to the Bank under 11 U.S.C. § 361(2).

With respect to the Bank's argument that the payments from the Debtor constituted

---

3. In its Schedules, the Debtor valued its assets in the amount of $43,527.00 and listed liabilities in the amount of $463,161.81. The liabilities included a debt to the Bank in the amount of $265,900 and $92,778.90 of "Trust Fund" taxes owed to the Internal Revenue Service and to the Massachusetts Department of Revenue.

4. A comparison of the Trustee's affidavit and the Bank's answers to interrogatories reveals some minor discrepancies concerning the aggregate amount of payments made to the Bank. This is issue remains open at trial.

5. On May 23, 1994, the Bank filed a Motion for Relief from Stay in which it sought relief from stay with respect to all of the Debtor's assets, including the restaurant liquor license. The Trustee opposed the Motion to the extent that the Bank would be permitted to collect accounts receivable and cash which may be owed to the Debtor after the date of filing. After a hearing held on August 17, 1994, the Court entered an order granting relief from stay, except with respect to the said accounts receivable.

6. Through Count II of the Complaint, the Trustee seeks to recover pre-petition and post-petition payment on the Trust Note as a fraudulent conveyance pursuant to 11 U.S.C. § 544 and 11 U.S.C. § 548.

rent and were, therefore, made in the "ordinary course of business" under § 363(c)(1) and 11 U.S.C. § 1108, the Trustee answers in three ways. First, the Trustee asserts that the general provisions of § 1108 are limited by the more specific portions of § 363 governing use of cash collateral. The Trustee claims that, regardless of whether the purpose of the payments was proper, the source of the payments was improper if made from cash collateral, absent consent by all of the lienholders or court authorization. Second, the Trustee argues that the Bank had not taken appropriate steps to "perfect" its interest in the rents. The Trustee argues that the Bank's actions to enforce its Collateral Assignment failed to satisfy the requirements under the Collateral Assignment itself or the requirements under law for foreclosing on the Bank's interest in the rents. The Collateral Assignment provides that the Bank, on default, may "enter upon the mortgaged premises and collect ... the rents[.]" But the Bank only sent a letter of demand. The Trustee also claims that the Bank failed to "perfect" its interest in the rents in accordance with several Massachusetts bankruptcy court decisions in this District. *See e.g., In re Prichard Plaza Assocs. Ltd. Partnership,* 84 B.R. 289 (Bankr.D.Mass.1988). Third, the Trustee denies that the payments constituted rental payments since the amounts bore no relation to the sums called for under the Lease. While the rent under the Lease called for $4,725.00 per month, the Trustee asserts that the postpetition payments are in varying amounts and do not appear to track the payments required under the Lease.

Finally, in response to the Bank's defense that, pursuant to § 549(d), the Trustee cannot recover that portion of the payments made more than two years prior to the filing of the complaint, the Trustee claims that he can establish the applicability in this case of an exception based on equitable tolling principles.

## B. Bank's Argument

The Bank argues that the payments on the Note actually constituted rent from the Debtor to the Trust and the Bank was authorized to recover those sums from the Trust under the Collateral Assignment. The Bank maintains that it had a "perfected" interest in the rents under Massachusetts law. *See Prudential Ins. Co. of America v. Boston Harbor Marina Co.,* 159 B.R. 616 (D.Mass.1993). The Bank asserts that the payments, as rent, were ordinary business expenses of the Debtor under § 363(c)(1), and, absent payment, the Bank, by virtue of its Collateral Assignment, would have enjoyed an administrative expense claim against the estate for the reasonable value of the use and occupancy of the premises under § 503(b)(1)(A). The Bank further contends that the payments were not property of the estate.

With respect to the Trustee's argument that payments made to the Bank from the proceeds of its prepetition collateral constituted an unauthorized use of cash collateral, the Bank argues that there was a cash collateral agreement by *consent* of all the lienholders in accordance with 11 U.S.C. § 363(c)(2)(A), and therefore, court authorization was not required. The Bank asserts that it was the only lienholder that held an interest in the Debtor's cash collateral for the purposes of § 363(c)(2)(B), and therefore, it was the only party who needed to consent to the Debtor's use of cash collateral. To the extent that the IRS's lien did properly attach to the Debtor's property, the Bank argues that, even in the absence of court authorization, the Debtor was not required to obtain the IRS' affirmative consent to the use of cash collateral as the IRS had not raised an objection to its use during the pendency of the Chapter 11 case. As to payments made from assets of the Debtor arising postpetition, the Bank claims that those assets should be deemed subject to the Bank's lien under the "equities of the case" doctrine set forth in § 552(b).

Finally, the Bank asserts that if any payments made by the Debtor are otherwise avoidable by the Trustee under § 549(a), the Trustee cannot recover those payments made to the Bank more than two years prior to the date of the filing of the complaint—that is, August 25, 1992.

### III. DISCUSSION

#### A. Summary Judgment

 Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Fed. R.Bank.P. 7056, the Court may award partial summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *see also Aero–Fastener, Inc. v. Sierracin Corp. (In re Aero–Fastener, Inc.),* 177 B.R. 120, 135 (Bankr.D.Mass.1994). The nonmoving party "may not rest upon mere allegation[s] or denials of his [/her] pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. Thus, summary judgment is proper when, after adequate time for discovery, a party against whom judgment is sought fails to show a sufficient basis for the establishment of an essential element of its case. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

#### B. Section 549(a)

 The Trustee's Complaint seeks to recover postpetition payments made by the Debtor to the Bank during the pendency of the Chapter 11, pursuant to 11 U.S.C. § 549(a). Section 549(a) permits the trustee to avoid a postpetition transfer of estate property that is not authorized by the Bankruptcy Code or by the court. *See* 11 U.S.C. § 549(a). It provides:

(a) Except as provided in subsection (b) of (c) of this section, the trustee may avoid a transfer of property of the estate—

　(1) occurs after the commencement of the case; and

　(2)(A) that is authorized only under section 303(f) or 542(c) of this title; or

　(B) that is not authorized under this title or by the court.

11 U.S.C. § 549(a).

 Section 549(a) is limited to transfers involving property of the estate. The Trustee asserts that the funds, which constituted receipts from the Debtor's restaurant operation, were property of the estate pursuant to 11 U.S.C. § 541(a)(6) and (a)(7).[7] The Trustee submits that the Bank received payments, *after* the filing of the petition and during the pendency of the Chapter 11, in the following amounts: (1) $17,425.69 in 1991; (2) $27,520.50 in 1992; (3) $29,154.04 in 1993; and (4) $6,773.16 in 1994.

 In its Answer, the Bank flatly denies the Trustee's allegation that the payments made to the Bank were property of the estate. However, it has not submitted an affidavit which would demonstrate a genuine issue of material fact on this issue. *See In re Aero–Fastener, Inc.,* 177 B.R. at 135. Moreover, the Bank has admitted in its responses to the Trustee's interrogatories that (1) payments were made to the Bank after the commencement of the case, (2) the payments made to the Bank came from the Debtor, and (3) the payments were made to the Bank in the amounts asserted by the Trustee. Payments made by a debtor to a secured creditor do not lose their character as property of the estate. *Lowe v. Sheinfeld, Maley & Kay, P.C. (In re Saunders),* 155 B.R. 405, 414 (Bankr.W.D.Tex.1993).

Based on the foregoing, the Court finds that the Trustee has sustained its burden of proving that the payments made to the Bank were property of the Debtor's estate for purposes of § 549(a).

#### 1. Payments Made From the Proceeds of Prepetition Collateral.

 The Trustee argues that the payments made out of prepetition collateral con-

---

7. Subsections (6) and (7) of § 541(a) provide that property of the estate includes:
　(6) Proceeds, product, offspring, rents, and or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.
　(7) Any interest in property that the estate acquires after the commencement of the case.
11 U.S.C. § 541(a)(6)–(7).

stituted the use of cash collateral not authorized by the Court and not enjoying the consent of all lienholders as required by § 363(c)(2) and, therefore, not authorized under the Bankruptcy Code for the purposes of § 549(a)(2)(B).[8]

Section 363(a) defines "cash collateral" as: cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a). The Bank does not dispute that at the commencement of the case, the cash, deposits and accounts receivable held by the Debtor constituted "cash collateral" for the purposes of § 363 and that the Debtor used cash collateral to make the payments to the Bank. Rather, the Bank claims that the Debtor was authorized to use the cash collateral to make those payments.

Section 363(c)(1) provides:

If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, included the sale or lease of property of the estate, in the ordinary course of business, without notice or hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1). The statute provides that if the business of the debtor is authorized to be operated under the Bankruptcy Code, then the trustee may use, sell or lease *property of the estate* in the ordinary course of business without notice or hearing. However, this authority is limited by subsection (c)(2). Section 363(c)(2) provides:

The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice or hearing, authorizes such use, sale or lease in accordance of this section.

11 U.S.C. § 363(c)(2). Section 363(c)(2) prohibits the use of cash collateral unless all creditors holding a security interest in the cash collateral consent or the court authorizes the use of cash collateral after notice and a hearing. Therefore, while § 363(c)(1) authorizes the trustee to use, sell or lease *property of the estate* in the ordinary course of business without notice and hearing, § 363(c)(2) restricts that authority if the property is cash collateral. One commentator has stated:

Section 363(c) is at the heart of the treatment in the Code of the power of the trustee to use cash collateral or other property in which another entity has an interest in the ordinary course of business of the debtor. As long as the business of the debtor is authorized to operate and unless the court orders otherwise, as a general rule the trustee may use, sell, or lease property of the estate in the ordinary course of business without notice or a hearing.... [N]ot apparent from the wording of section 363, there are exceptions to section 363(c) to be found elsewhere in the Code. The most important exception is where the property is "cash collateral" is defined in section 363(a)[.] It was recognized that due to the unique nature of cash collateral, specific protections should apply to prevent its dissipation, leaving the court and the entity with an interest therein with a *fait accompli.*

2 COLLIER ON BANKRUPTCY § 363.04 (15th ed.1995). *See In re Quality Beverage Co., Inc.,* 181 B.R. 887, 896 (Bankr.S.D.Tex. 1995) ("A chapter 11 Debtor in possession is required to segregate cash collateral, and is not permitted to use cash collateral in the ordinary course of business unless each entity that has an interest in the cash collateral consents.").

---

**8.** Section 549(a)(2)(A) clearly has no application to the facts of this case.

For the purposes of § 363(c)(2)(B), it is undisputed that the Debtor never sought cash collateral authorization from the Court. For the purposes of § 363(c)(2)(A), the Bank asserts that IRS was not a lienholder, and therefore, did not have to consent to the Debtor's use of cash collateral. Alternatively, the Bank asserts that even if the IRS was a lienholder, its affirmative consent was not required as the IRS never filed an objection to the Debtor's use of cash collateral during the pendency of the Chapter 11 case.

This issue is easily resolved. The Trustee filed a supplemental affidavit and a copy of the amended proof of claim filed by the IRS on August 3, 1994. The proof of claim indicates that the IRS filed two (2) notices of tax lien on April 24, 1991 for taxes in the amount of $31,821.61. A federal tax lien grants the United States an interest in all of the debtor's prepetition assets. *See In re M. Gallo, Inc.*, 113 B.R. 83, 84 (Bankr.M.D.Fla.1990); *In re National Financial Alternatives, Inc.*, 96 B.R. 844, 847 (Bankr.N.D.Ill.1989). Although the Bank maintains that there is a genuine factual issue as to whether the IRS is a lienholder for the purposes of § 363(c)(2)(A), the Bank has not filed an opposing affidavit setting forth support for that view. Therefore, the Court finds that the IRS was "an entity that ha[d] an interest in . . . cash collateral" for the purposes of § 363(c)(2)(A).

■ The statute clearly indicates that "[t]he trustee *may not* use, sell or lease cash collateral . . . unless . . . each entity that has an interest in such cash collateral consents." 11 U.S.C. 363(c)(2)(A) (emphasis supplied). The Bank's contention that there is no requirement for affirmative consent by the IRS to the use of its cash collateral is inconsistent with the plain language of the statute. This Court does not believe that the failure of a secured creditor to object to the unauthorized use of cash collateral is tantamount to

that creditor's consent to the use of cash collateral. *See Freightliner Market Development Corp. v. Silver Wheel Freightlines, Inc.*, 823 F.2d 362, 368 (9th Cir.1987) ("The purposes underlying § 362(c)(2) & (4) require that a debtor seek affirmative express consent from all parties involved before using cash collateral. . . . [I]mplied consent [is] insufficient to satisfy the requirements of § 362(c)(2)."); *see also United Bank of Arizona v. United States (In re Stewart–Smith Construction)*, 892 F.2d 1046 (9th Cir.1989).[9] The Debtor's failure to obtain the express consent of the IRS for the use of cash collateral violated § 363(c)(2)(A). Therefore, the Court finds and rules that the payments constituting cash collateral made by the Debtor to the Bank were not authorized under the Bankruptcy Code pursuant to § 549(a)(2)(B).

The foregoing rulings against the Bank are not, however, the end of the inquiry relative to these payments made from the proceeds of prepetition collateral. It is necessary to determine where the payments would go if they were avoided, pursuant to § 549. If the Bank enjoyed the first position on the Debtor's prepetition collateral, there would be no reason to compel turnover of these payments. If the payments would be returned ultimately to the Bank upon disbursement of the assets of the estate, no benefit to the estate would accrue by their avoidance. *See EEE Commercial Corp. v. Holmes (In re ASI Reactivation, Inc.)*, 934 F.2d 1315, 1321 (4th Cir.1991); *Lowe v. Sheinfeld, Maley & Kay, P.C. (In re Saunders)*, 155 B.R. at 414–15; *In re Willmar Nursing Home*, No. 4–89–2921, Adv. No. 4–19–14, 1991 WL 172017 *4 (Bankr.D.Minn. Aug. 21, 1991), *aff'd*, 996 F.2d 1222 (8th Cir.1993); *Dave Noake, Inc. v. Harold's Garage, Inc. (In re Dave Noake, Inc.)*, 45 B.R. 555, 557 (Bankr.D.Vermont 1984).

9. Although secured lenders, for practical purposes, are often forced to file motions to *prohibit* the Debtor's unauthorized use of cash collateral, this necessarily remedial strategy does not substitute for the obligation of a debtor-in-possession to seek court authorization (or obtain the necessary consents) to use cash collateral from the outset. The failure of such a debtor to seek cash collateral authorization (or obtain the necessary consents), when applicable, reveals a profound ignorance by that debtor of the responsibilities attendant to its status. In appropriate cases, such a failure should be considered in conjunction with the viability of a Chapter 11 case or the continuation of the debtor in possession. See 11 U.S.C. §§ 1104(a)(1), 1112(b).

■ The only other creditor secured by the Debtor's prepetition assets is the United States, by way of the IRS prepetition tax liens. Section 6323(c)[10] of the Internal Revenue Code generally provides that a tax lien is valid against (has priority over) a competing prior security interest in assets acquired by a debtor *after* forty-five days following the filing of the tax lien. During the first forty-five days, the competing prior security interest has priority over the .tax lien. In this case, the tax liens were recorded on April 24, 1991, while the date of case commencement was June 4, 1991, forty-one days later. Therefore, the Bank's security interest was senior to the IRS' tax liens in this case with respect to all assets acquired by the Debtor prepetition. Avoidance of the payments received by the Bank constituting the proceeds of its prepetition collateral will not consequently benefit the estate or any other creditor. There is, therefore, no reason to avoid them.[11]

### 2. Payments From Property of the Estate Acquired Postpetition

■ Section 552 of. the Bankruptcy Code concerns the effect of a prepetition security interest in postpetition property. Generally, a creditor's prepetition security interest does not extend to after acquired property by the estate. *See United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 374, 108 S.Ct. 626, 632, 98 L.Ed.2d 740 (1988).

It provides in part:

Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

11 U.S.C. § 552(a). An exception to this rule is stated in § 552(b):

Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, or profits of such property, then such security interest extends to such proceeds, product, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy

---

**10.** Section 6323(c) of the Internal Revenue Code provides in relevant part:

(1) **In General.**—To the extent provided in this subsection, even though notice of a lien imposed by section § 6321 has been filed, such lien shall not be valid with respect to a security interest which came into existence after the tax lien filing but which—

(A) is in qualified property covered by the terms of a written agreement entered into before the tax lien filing and constituting—
(i) a commercial transactions financing agreement[.] ...

(2) **Commercial transactions financing agreement.**— For purposes of this subsection—

(A) Definition.—The term "commercial transactions financing agreement" means an agreement (entered into by a person in the course of his trade or business)—
(i) to make loans to the taxpayer to be secured by commercial financing security acquired by the taxpayer in the ordinary course of his trade or business, or
(2) to purchase commercial financing security (other than inventory) acquired by the taxpayer in the ordinary course of his trade or business;

but such an agreement shall be treated as coming within the term only to the extent that such loan or purchase is made before the 46th day after the date of the tax lien filing or (if earlier) before, the lender or purchase had actual notice or knowledge of such tax lien filing.

(B) **Limitation ·on qualified property.**—The term "qualified property", when used with respect to commercial transactions financing agreement, includes only commercial financing security acquired by the taxpayer before the 46th day after the date of the tax lien filing.

(C) **Commercial financing · security defined.**—The term "commercial financing security" means (i) paper of a kind ordinarily arising in commercial transactions, (ii) accounts receivable, (iii) mortgages on real property and (iv) inventory.

26 U.S.C. § 6323(c)(1)–(2).

**11.** Even if the payments turn out to be "excess" rental payments, see infra, the result would be the same if the avoided by the Trustee.

law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise. 11 U.S.C. § 552(b). In order for a creditor with a prepetition lien to continue that lien in property acquired by a debtor postpetition, it is incumbent on the secured party to obtain a court order granting a lien in post-petition property (commonly referred to as a "rollover lien"). In the instant case, the Bank failed to obtain a rollover lien. Therefore, the payments representing the proceeds of assets (e.g., accounts-receivable) acquired by the Debtor postpetition are not subject to any lien by the Bank. *See New Hampshire Business Development Corp. v. Cross Baking Co., Inc. (In re Cross Baking Co., Inc.)*, 818 F.2d 1027 (1st Cir.1987).

 The Bank argues that the Court may grant the Bank a retroactive rollover lien based on the "equities of the case", pursuant to language found in § 552(b) (" ... except to any extent that the court after notice and hearing and based on the equities of the case, orders otherwise"). This argument was made in the *Cross Baking* case and rejected by this Circuit. *Id.* at 1032–34. The First Circuit stated:

> Section 552(b) states the rule regarding postpetition treatment of proceeds and permits an adjustment of a creditor's security interest in proceeds if the equities of the case demand it. It is not a general grant of equitable power permitting a court to correct a secured creditor's errors by recognizing a security interest in nonproceeds, such as money collected by the trustee in this case.

*Id.* at 1032–33. In reviewing the legislative history, the court noted that the "equities of the case" provision was not intended to be broadly construed. *Id.* at 1033 ("the 'equities of the case' proviso is a legislative attempt to address those instances where expenditures of the estate enhance the value of proceeds which, if not adjusted, would lead to an unjust enrichment improvement of the secured party's position."). The "equities of the case" language is intended to, in appropriate cases, afford unsecured creditors the opportunity to surcharge collateral of secured

creditors. *See Id.* It is not an opportunity for a creditor without a postpetition lien to obtain one.

 Notwithstanding this Court's ruling that the Bank has (and had) no security interest in assets that the Debtor acquired postpetition, genuine issues of material fact remain.

First, the Court must determine the allocation of payments to prepetition and postpetition accounts receivable.

Second, to the extent that the payments made to the Bank constituted postpetition accounts receivable, the Court must determine whether the payments represented *rent* or *payments* on the Note (and Trust Note). The Trustee insists that the Bank has admitted in its answers to interrogatories that the payments were made on the Note. The Trustee's interrogatory (# 8) asks:

> Please identify with specificity every payment received by the Bank on the Note (as defined in the Trustee's Complaint) during 1991, providing, with respect to each such payment, the following:
>
> a. the amount of each payment;
>
> b. the date upon which each payment was received;
>
> c. the person or entity making such payment.[12]

The Bank answered by listing each payment amount and the date upon which each payment was received. The Debtor was listed as the entity making each payment.

The Bank claims that there is a genuine issue of material fact as to whether the payments were rent. The Bank submitted the affidavit of Edwin Newalu, who was President, Director and a stockholder of the Debtor prior to and during the bankruptcy proceedings. In his affidavit, Mr. Newalu states:

> Prior to filing of the Chapter 11 Bankruptcy Petition, I was informed by [the Bank] that all rental payments that were due from the [Debtor] to the Trust should be sent to the Bank. The lease payments were originally set at a figure which was

---

**12.** See Exhibit "J" of the Trustee's Affidavit in Support of Motion for Summary Judgment.

approximately the same as the amount of the mortgage payments due on the [Note] that was secured by the property. I was aware that the rent payment would go the Bank to be applied to the mortgage, real estate taxes and gas and electric liens that the [Debtor] has not paid. The payment of the rent to be applied to the mortgage and municipal liens was in the usual course of the [Debtor's] business both before and after the Chapter 11 filing. After the filing of the Chapter 11 petition, I consented, on behalf of the [Debtor], to the continued payment of the rent payments to the Bank and listed these payments on the statements filed with the Trustee's office. The payments were listed as rent on the Corporate tax returns.

In further support of its contention that the payments constituted rent, the Bank attaches profit and loss statements that were submitted by the Debtor to the United States Trustee. These statements purport to identify rental payments made in varying amounts.

This Court is not persuaded that the Bank's answers to the Trustee's interrogatories constituted admissions that the payments were direct payments on the Note rather than rent. The Trustee asked the Bank to identify "every payment received by the Bank on the Note." But the Debtor was not the only entity obligated under the Note. The Debtor and the Trust were co-makers on the Note. The Trust (the owner of the Property) granted to the Bank a first mortgage and Collateral Assignment as collateral for its obligations on the Note. The Debtor was obligated to pay the Trust rent for its use and occupancy of the Property and the Bank was entitled to receive those rents under the Collateral Assignment.[13] Insofar as those rents were collateral for the Trust's obligations *under the Note*, in that sense all

payments received by the Bank were payments on the Note, irrespective of whether they were direct payments by the Debtor on the Note or rents of the Debtor collected by the Bank on account of the Trust obligation on the same Note. Based on (1) the ambiguity of the interrogatory, (2) the affidavit of Mr. Newalu, and (3) the profit and loss reports evidencing payment of rent, the Court is persuaded that there is a genuine issue of material fact as to whether the payments to the Bank represented rent paid by the Debtor to the Trust or direct payments on the Note.

■ If the payments constituted direct payments on the Note, they are avoidable, pursuant to §§ 552(a) and 549(a) (subject to § 549(d)). If the payments represented rent, then the Bank's entitlement to the rent may depend on how much of the rent the Debtor should have paid to the Trust. For the sixty (60) day period from the date of filing, the Trust was entitled to receive rent at the contract rate. 11 U.S.C. § 365(d)(3); *see In re All for A Dollar*, 174 B.R. 358, 360 (Bankr. D.Mass.1994). For the remaining period of time in which the Debtor occupied the property 11 (the Lease having been rejected as matter of law pursuant to 11 U.S.C. § 365[d][1]), the Trust was entitled to no more than the reasonable rental value for the property under 11 U.S.C. § 503(b)(1). *See In re Sanborn*, 181 B.R. 683, 687 (Bankr. D.Mass.1995); *In re Energy Resources, Inc.*, 47 B.R. 337 (Bankr.D.Mass.1985). If the Debtor's payments exceeded that reasonable rental value, the excess portion of the rents would be recoverable under § 549(a), unless the Bank could establish it was a "mediate transferee" under § 550(b)(1) and took the payments in "good faith, and without knowledge of the voidability of the transfer". If that latter argument were successful, the

---

13. The Court rejects the Trustee's argument that the Trustee is entitled to the rental payments because the Bank did not comply with state law in failing to make entry onto the Property to collect rents under the Collateral Assignment. The Trustee's reliance on *Prichard Plaza*, 84 B.R. 289, is misplaced for two reasons. First, *Prichard Plaza* dealt with the requirements for perfecting an interest in rents where the Debtor was the lessor. In the instant case, the Debtor is not the

lessor but the lessee. The perfection issue is between the Trust and the Bank. If the payments were rent and not owed to the Bank, they would be owed to the Trust. Second, even if the perfection issue were relevant, this court would follow *Boston Harbor Marina*, 159 B.R. 616, and not *Prichard Plaza*. Finally, even if there were a technical default in the Bank's actions under the Collateral Assignment, the rents would, again, belong to the Trust.

excess amount of rents would then be recoverable by the Trustee only from the Trust.

 Finally, there remains a genuine issue of material fact as to what portion of the Trustee's recovery, if any, is barred by the statute of limitations under § 549(d). Section 549(d) provides:

> An action or proceeding under this section may not be commenced after the earlier of—
>
> > (1) two years after the date of the transfer sought to be avoided; or
> >
> > (2) the time the case is closed or dismissed.

11 U.S.C. § 549(d). In the instant case, the Trustee filed the Complaint on August 25, 1994 seeking to avoid payments made by the Debtor to the Bank from June 18, 1991 through March 31, 1994. The Bank asserts that the Trustee is barred from commencing an avoidance action to recover the payments made prior to August 25, 1992. The Bank relies on the Massachusetts bankruptcy decision of *In re A.J. Lane,* 167 B.R. 729 (Bankr. D.Mass.1994), wherein the court found that a trustee's avoidance action, pursuant to § 549, filed more than two (2) years after the transfer, was barred where no fraudulent concealment was shown to establish the trustee's equitable tolling argument. The Trustee argues that the deadline imposed by § 549(d) is subject to the doctrine of equitable tolling. In support thereof, the Trustee asserts that doctrine is applicable where the Trustee was appointed more than two (2) years after some of the transfers occurred.

The application of the equitable tolling doctrine presents another genuine issue of material fact. But if the Court decides not to equitably toll the statute of limitations under § 549(a), recovery by the Trustee of payments made prior to August 25, 1992 would be barred.[14]

## IV. *CONCLUSION*

Based on the foregoing, the Court hereby denies the Trustee's Motion for Partial Summary Judgment, except that it shall deem as

established for the purposes of trial that (1) the Trustee may not recover any payments made by the Debtor to the Bank out of the proceeds of prepetition collateral, and (2) the Trustee may recover payments made by the Debtor to the Bank to the extent made out of assets acquired by the Debtor postpetition, unless the payments were unavoidable rental payments by the Debtor to or behalf of the Trust and recovery is not barred by § 549(d).

A trial is scheduled for January 19, 1995 at 10:00 a.m. in Worcester. A second pre-trial order will issue.

---

**14.** The payments applied to the Note after August 25, 1992 are calculated in the approximate amount of $44,296.54, not including the alleged

tax escrow payments in the approximate amount of $12,379.55.