### In re GEMEL INTERNATIONAL, INC., Debtor.

### CARGOCAIRE ENGINEERING CORP., Plaintiff,

v.

### Kathleen DWYER, in her capacity as Chapter 7 Trustee and Gemel International, Inc., Defendants.

**Bankruptcy No. 93–17607–JNF. Adv. No. 95–1454.**

United States Bankruptcy Court, D. Massachusetts.

Dec. 21, 1995.

---

Kevin M. Hensley, Needham & Warren, Boston, MA, for Plaintiff.

Kathleen P. Dwyer, Ardiff & Morse, P.C., Danvers, MA, for Defendants.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

## I. INTRODUCTION

The matter before the Court is the Motion for Judgment on the Pleadings filed by the Plaintiff, Cargocaire Engineering Corp. ("Cargocaire"), in its adversary proceeding against the Debtor and the Chapter 7 Trustee. Through its Complaint, Cargocaire seeks a declaratory judgment that "the plaintiff's claim is secured by all property of the estate, except for property that the trustee can prove is not proceeds of the debtor's prepetition accounts receivable."

## II. FACTS

The Debtor filed a voluntary petition under Chapter 11 on August 23, 1993. The Debtor listed Cargocaire as an unsecured creditor on Schedule F with a claim of $43,-685.66. It listed only one secured creditor, GMAC, with a lien on a motor vehicle. On Schedule B, the Debtor indicated that it had $230,000.00 of accounts receivable "in its possession." In its Statement of Financial Affairs, the Debtor disclosed that Cargocaire had obtained a trustee process attachment in an undisclosed sum on August 19, 1993 and that the Internal Revenue Service had levied upon a bank account and recorded a lien on August 24, 1993 in the amount of $35,215.29.

During the course of the Chapter 11 proceeding, the Debtor did not seek permission to use cash collateral. No creditors filed objections to its use or sought orders from this Court prohibiting the Debtor from using its cash collateral.

On June 8, 1994, Cargocaire filed a Motion to Dismiss, or in the Alternative, to Fix Time for Debtor to Propose a Plan. In its Motion to Dismiss, Cargocaire did not indicate whether it was a secured or an unsecured creditor. Rather, it complained that the Debtor had not proposed a plan of reorganization in the nine and one-half months it had been under the protection of the bankruptcy court and that this delay was prejudicial to it and other creditors. Additionally, as an alternative to the dismissal of the case, Cargocaire asked the Court to impose a deadline for the filing of a disclosure statement and plan of reorganization.

The Court conducted a hearing on Cargocaire's Motion to Dismiss and ordered the Debtor to file a disclosure statement and

plan by August 26, 1994. Although the Debtor obtained approval of a disclosure statement, the Debtor was unable to propose a plan that overcame objections of parties in interest. On March 21, 1995, it moved to convert from Chapter 11 to Chapter 7. The Court allowed the motion, the case was converted to a case under Chapter 7, and a Trustee was appointed.

On July 28, 1995, Cargocaire filed its Complaint against the Debtor and the Chapter 7 Trustee. In its Complaint, it alleged that it holds a perfected security interest in the proceeds of the Debtor's pre-petition accounts receivable and that the Debtor failed to segregate and account for cash collateral derived from collection of pre-petition accounts receivable. According to Cargocaire, this conduct prevented it from tracing the proceeds of the Debtor's pre-petition accounts receivable.

The Trustee, in her answer, admitted that Cargocaire has a perfected security interest in the proceeds of the Debtor's pre-petition accounts receivable "to the extent any such pre-petition account [sic] receivable remain uncollected."[1] The Trustee also admitted that the Debtor failed to segregate cash collateral derived from collection of pre-petition accounts receivable.

## III. POSITIONS OF THE PARTIES

### A. *Cargocaire*

Cargocaire, in its Memorandum in support of its Motion for Judgment on the Pleadings, maintains that it is not required "to pay" for the Debtor's failure to segregate its pre-petition accounts receivable, and "[t]he Bankruptcy Code gives [it] the benefit of the doubt in these circumstances and shifts the burden of 'tracing' proceeds to the Trustee." Cargocaire relies exclusively upon *Freightliner Market Development Corp. v. Silver Wheel Freightlines, Inc.*, 823 F.2d 362 (9th Cir.1987), for the proposition that the Trustee must prove that property of the estate does not include proceeds of pre-petition accounts receivable in which the Debtor had a security interest. Cargocaire also cites cases

in which courts have given creditors replacement liens in situations where debtors have dissipated or commingled cash collateral in violation of the Bankruptcy Code. *See In re Placid Oil Co.*, 80 B.R. 824, 831 (Bankr. N.D.Tex.1987); *In re Aerosmith Denton Corp.*, 36 B.R. 116, 119 (Bankr.N.D.Tex. 1983).

### B. *The Trustee*

The Trustee maintains that Cargocaire is not entitled to judgment as a matter of law because there are material facts in dispute. The Trustee relies upon section 552 of the Bankruptcy Code to argue that a creditor's security interest does not extend to property acquired by a debtor post-petition except to the extent that the post-petition property is identifiable proceeds of pre-petition collateral. Relying upon *New Hampshire Development Corp. v. Cross Baking Co., Inc. (In re Cross Baking Co., Inc.)*, 818 F.2d 1027 (1st Cir.1987), the Trustee states that receivables that arose after the filing of the bankruptcy petition do not constitute proceeds of pre-petition receivables under section 552(b). The Trustee further argues that the "equities of the case" language in section 552(b) is not a source of authority for the grant of a retroactive replacement lien, *Cross Baking*, 818 F.2d at 1032–33; *Weiss v. People Savings Bank (In re Three Partners, Inc.)*, 27 Bankr.Ct.Dec. 1151, 1995 WL 584519 (Bankr. D.Mass. September 29, 1995) ("[t]he 'equities of the case' language is intended to, in appropriate cases, afford unsecured creditors the opportunity to surcharge collateral of secured creditors. It is not an opportunity for a creditor without a postpetition lien to obtain one."). Finally, the Trustee argues that in the event the Court were to consider the equities of the case, disputed facts must be considered before a replacement lien could be granted.

## IV. DISCUSSION

### A. *Statutory Framework*

Under section 363(c)(2), the trustee or debtor-in-possession may not use cash collateral unless—

---

1. Cargocaire, in its Memorandum in support of its Motion for Judgment on the Pleadings, added the fact that its security interest in the Debtor's accounts receivable and proceeds was perfected in September of 1991. Cargocaire did not attach any note, security agreement or UCC financing statements to any of its pleadings.

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2). Additionally, section 363(c)(4) provides that "[e]xcept as provided in paragraph (2) of this section, the trustee shall segregate and account for any cash collateral in the trustee's possession, custody, or control." *Id.* § 363(c)(4). Finally, section 363(*o*) provides that "[i]n any hearing under this section—(1) the trustee has the burden of proof on the issue of adequate protection; and (2) the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest." *Id.* § 363(*o*). Finally, section 552 provides in relevant part the following:

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

(b) Except as provided in sections 363, 506(c), 522, 544, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds ... of such property, then such security interest extends to such proceeds ... acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

*Id.* § 552(a)–(b)(1).

### B. *The Cross Baking Decision*

The United States Court of Appeals for the First Circuit considered the interplay of the above sections in *Cross Baking* when it evaluated the effect of section 552(b) on "the rights of a secured creditor holding a floating lien on a debtor's accounts receivable." 818

F.2d at 1028. The debtor in *Cross Baking* filed a Chapter 11 petition in June of 1980, at a time when New Hampshire Business Development Corporation ("NHBDC") held a security interest in the first $50,000.00 of its accounts receivable. NHBDC and another secured creditor agreed to permit the debtor to use the cash generated by its pre-petition receivables. However, the parties failed to obtain an order from the bankruptcy court authorizing such use. The debtor operated in Chapter 11 for approximately seven months during which time payments by the debtor's customers satisfied the outstanding balances of most, but not all, of the accounts receivable in existence at the time of the commencement of the case. *Id.* at 1029. The debtor's reorganization was unsuccessful, and the court appointed a Chapter 11 trustee, who promptly moved to convert the case to a case under Chapter 7. Immediately upon the filing of the conversion motion, NHBDC filed a motion for relief from the automatic stay and a motion to prohibit the debtor from using proceeds of its cash collateral. NHBDC sought to recover up to $50,000.00 in funds the trustee was collecting from the liquidation of accounts receivable "most of which arose after the filing of the bankruptcy petition." *Id.*

The Court noted that NHBDC was seeking recovery of a portion of the liquidated post-petition proceeds based upon two theories: 1) that a portion of the money collected by the trustee should be considered the actual proceeds of the pre-petition accounts; and 2) that "even if the collected funds are not actually the proceeds of the original collateral, equitable considerations favor ... treating part of the collected money as representing the proceeds to which NHBDC's security interest should continue to attach."

According to the appellate court, the bankruptcy court found that NHBDC conditionally assented to the use of its cash collateral. Because of this consent, NHBDC urged the court to assume that the debtor purposefully segregated the proceeds of its pre-petition accounts by " 'billing its customers and collecting from them on a current basis.' " *Id.* at 1020. The court rejected this argument, stating that the debtor was " 'justified in

proceeding on the basis that it had the actual consent of NHBDC to use the receivables collections pending the eventual submission of a stipulated order to the court.'" *Id.* The court added the following:

> ... NHBDC's consent permitted Cross to spend (and lose) the proceeds of NHBDC's cash collateral that were paid to the business during the attempted reorganization. As we noted earlier, the amount paid on virtually every account during reorganization equalled or exceeded the balances owed at the time Cross filed its bankruptcy petition. Thus, the bankruptcy court correctly found that all of the money at issue in this case (except for the small amount which the trustee concedes to be payments on pre-petition receivables) was collected in satisfaction of receivables that arose after the filing of a bankruptcy petition. Such post-petition receivables generally do not constitute 'proceeds' of pre-petition receivables under 552(b)....

*Id.* at 1031 (citations omitted).

With respect to the debtor's second argument, the court stated the following:

> Section 552(b) states the rule regarding the post-petition treatment of proceeds and permits an adjustment of a creditor's security interest in proceeds if the equities of the case demand it. It is not a general grant of equitable power permitting a court to correct a secured creditor's errors by recognizing a security interest in non-proceeds, such as the money collected by the trustee in this case.

> \*    \*    \*    \*    \*    \*

We therefore believe that it is incorrect to consider the equities of the case when the contested property, as in the case at bar, does not constitute proceeds of the secured creditor's original collateral.

*Id.* at 1032–33 (citations omitted).[2]

Several important points must be made about the *Cross Baking* decision. In the first place, the accounting records were intact and considerably more detailed than what appears to be the situation in the present case. In the instant case, without discovery, neither the Trustee nor Cargocaire is in a position to establish to what extent the monies now held by the Chapter 7 Trustee are proceeds of pre-petition accounts receivable or proceeds of accounts generated by the post-petition activities of the Debtor prior to conversion of its case to a case under Chapter 7.

Secondly, the court in *Cross Baking*, without elaboration or citation to authority, in a footnote stated that "in the absence of consent or a court order, [a debtor's] failure to segregate or otherwise preserve the proceeds of the pre-petition receivables would violate section 363(c)(2) and *arguably* entitle NHBDC to a portion of the liquidated post-petition receivables." *Id.* at 1030 n. 5 (emphasis supplied). The court did not indicate whether NHBDC would have the burden of proving its entitlement to a portion of the liquidated post-petition receivables. Additionally, the Court did not discuss *In re Aerosmith Denton Corp.*, 36 B.R. 116 (Bankr. N.D.Tex.1983), which was cited by Bankruptcy Judge Yacos in *In re J.L. Graphics, Inc.*, 62 B.R. 750 (Bankr.D.N.H.1986), one of the two cases presenting the same issue that generated the appeal in *Cross Baking*.

In *In re Aerosmith Denton Corp.*, 36 B.R. 116 (Bankr.N.D.Tex.1983), the court considered a complaint for sanctions filed by a secured creditor against a Chapter 11 debtor and its attorney with respect to the debtor's unauthorized use of cash collateral. The

---

**2.** *In reaching its decision, the court of appeals found the legislative history of section 552(b) to be "particularly helpful in determining the scope of the equitable powers outlined in section 552(b)." 818 F.2d at 1033. It concluded from its reading of the legislative history*

> that the "equities of the case" proviso is a legislative attempt to address those instances where expenditures of the estate enhance the value of proceeds which, if not adjusted, would

> lead to an unjust improvement of the secured party's position. In such cases Congress intended for courts to limit the secured party's interest in the proceeds according to the equities of the case so as to avoid prejudicing the unsecured creditors. Nothing in the legislative history implies that the "equities of the case" proviso should be read more broadly to encompass the meaning favored by NHBDC.

*Id.*

court relied upon 11 U.S.C. § 105 to grant a secured creditor a replacement lien on post-petition receivables. The court stated the following:

Regardless of the debtor's argument that § 105 was not intended to confer the power to create lien rights the Court does have an obligation to carry out the intent of Congress in its enactment of the Bankruptcy Code. As mentioned above the continuation of lending transactions between the business community on the one hand and lending institutions on the other require that liens negotiated in good faith and for which full consideration has been given must be protected. Adoption of the theory advanced by the debtor that there are no applicable sanctions so that a valid lien of a creditor is recognized by the Court but both the Court and the creditor are powerless to preserve and protect that lien after bankruptcy has been initiated will result in anarchy. That cannot be the result intended by Congress. Therefore, I have interpreted § 105(a) of the Code as giving to the Court the power and the duty to do those things which are reasonably required to protect the Court's jurisdiction and to carry out the intent of Title 11.

36 B.R. at 119.

Judge Yacos in *J.L Graphics*, a case in which the secured party consented to the use of cash collateral, took a dim view of the use of equitable powers to grant a retroactive order authorizing borrowing and attachment

of liens, 62 B.R. at 755. He noted that in view of the ability of debtors and creditors to promptly obtain interim orders authorizing borrowing or the use of cash collateral "the rationale for permitting retroactive validation orders for secured borrowing and attachment of liens to post-petition transactions no longer exists." *Id.* (footnote omitted).[3] The court of appeals in *Cross Baking* appears to have adopted this view as well based upon the legislative history of section 552(b). 818 F.2d at 1032–33.

The court in *Cross Baking* also did not discuss *In re Etch–Art, Inc.*, 48 B.R. 143 (Bankr.D.R.I.1985). The *Etch–Art* case involved a situation in which the debtor and its principal failed to comply with both a temporary restraining order and the provisions of section 363(c)(2), and the secured party moved for an order to show cause why they should not be held in contempt. The court, in refusing to issue a contempt order, indicated that the burden was on the secured party to distinguish between receivables which stem from post-petition collateral, not covered by the security agreement, and those receivables which might be covered. 48 B.R. at 146. The court also noted that in circumstances where collateral is improperly used it was "not powerless to attempt to determine the extent to which collateral was improperly used, or to address the ... post-petition misdeeds by the entry of an appropriate award of money damages." *Id.*

**3.** The court added the following observations:

The court is not unmoved by the Bank's contention that it is simply 'unfair' not to grant it a nunc pro tunc order authorizing the borrowing and lien attachment agreement in circumstances in which the debtor-in-possession in fact received the benefit of the continued financing and use of cash collateral....

\* \* \* \* \* \*

To accede to the Bank's equitable arguments, however, would be in effect to rewrite the statute and negate important practical considerations underlying lien attachment of floating liens after notice to creditors in the reorganization proceedings. While the debtor and lender may well agree to a continued financing arrangement, in order to permit the debtor's business operations to continue, the creditors in a particular case may well be of the view that continued business operation is not in

their interest and that liquidation is an appropriate alternative....

The Bank argues that it is likely that the court 'would have approved' this financing arrangement had it been brought before the court on notice and hearing prior to the Chapter 7 conversion, and that the court accordingly as an equitable matter should now make that determination upon an appropriate evidentiary showing.... It is true that the court could conduct such hearings and make such determinations after an appropriate showing by both the lender and the subsequent Chapter 7 trustee. But this in effect forces the liquidating trustee to expend assets of the estate, otherwise available for distribution to creditors, in engaging in litigation which is necessary only because the Bank did not seek immediate relief and orders authorizing post-petition financing and lien attachment.

62 B.R. at 755–56.

The cases from the First Circuit raise two issues: 1) what is the remedy for a debtor's misuse of cash collateral? and 2) does the burden of establishing entitlement to the remedy shift to the debtor or the debtor's successor, the Chapter 7 trustee? None of the cases discussed above provide clear-cut answers that would allow this Court to grant Cargocaire's Motion for Judgment on the Pleadings. Thus, Cargocaire's Motion can only be allowed if this Court were to adopt the holding in *Freightliner Market Development Corp. v. Silver Wheel Freightlines, Inc.*, 823 F.2d 362 (9th Cir.1987).

### C. *Analysis*

In *Freightliner,* the Court of Appeals for the Ninth Circuit noted that the creditor did not give actual consent to the trustee for the use of cash collateral and that the trustee did not obtain cash collateral orders from the bankruptcy court. In rejecting the trustee's arguments that the creditor gave either implied consent or should be estopped from denying its consent because it knew of the debtor's operations and knew that its monthly payments were coming from proceeds of its collateral, the court stated the following:

> we find that the purposes underlying 363(c)(2) & (4) require that a debtor seek affirmative *express* consent from all parties involved before using cash collateral.... Without deciding whether Freightliner, by its actions, gave the debtor its implied consent to use the cash collateral or is estopped from denying such consent, we find implied consent to be insufficient to satisfy the requirements of § 363(c)(2).

823 F.2d at 368–69 (emphasis supplied). *See also United Bank of Arizona v. United States (In re Stewart-Smith Construction),* 892 F.2d 1046 (9th Cir.1989); *In re Three Partners, Inc.,* 1995 WL 584519 at * 6. Because the debtor did not obtain the express consent of Freightliner, the court affirmed the decision of the bankruptcy court granting Freightliner a security interest in all of the debtor's pre- and post-petition accounts receivable, stating "that notions of equity and fairness support the bankruptcy court's shift of the burden of proof on the issue of tracing to the Trustee." *Id.* at 369. The Court

added "[t]his is especially true where, as here, the Trustee's predecessor, the debtor's [sic], breach of duty has created the confusion preventing proof of the issue." *Id.*

In reaching its decision, the *Freightliner* court relied upon *United States v. Hayes,* 369 F.2d 671 (9th Cir.1966), a case in which the court ruled that it was not error for the district court to shift the burden of proving the amount of a guaranteed obligation to the plaintiff who was attempting to enforce its default judgment against guarantors who were not parties to underlying action against their corporate principals. The court noted that the appellees (the guarantors) had not been associated with the corporations for eight years prior to the commencement of suit against them, and they had been divested of any interest in property which secured the original obligation.

■ This Court finds that the *Hayes* case provides scant justification for the court's decision in *Freightliner,* and even less support for shifting the burden of proof to the Trustee to obtain and sift through the Debtor's records to determine to what extent Cargocaire has a secured claim. This is particularly true where the *Freightliner* court did not address 11 U.S.C. § 363(*o*) in shifting the burden of proof under 11 U.S.C. § 362(g).

■ Additionally, the *Freightliner* decision appears to be predicated upon the notion that the Trustee is stained with the sins of his or her predecessor—the debtor-in-possession. While it is true that a Chapter 7 trustee succeeds to many of the rights and duties of debtor-in-possession, *compare* 11 U.S.C. § 704 *with* 11 U.S.C. §§ 1106, 1107, and may sue and be sued, *see* 11 U.S.C. § 323, this Court is neither bound nor persuaded by the *Freightliner* case, and, thus, is not convinced that the conversion of proceeds of pre-petition collateral is a misdeed for which a Chapter 7 trustee automatically must be held accountable without a consideration of all the facts and circumstances, or for which property of the estate, otherwise available for the benefit of unsecured creditors, automatically should be encumbered. *See Matter of National Safe Northeast, Inc.,* 76 B.R. 896, 906 (Bankr.D.Conn.1987) (where

creditor was on notice that debtor was using its cash collateral to continue its business and could have prohibited further use of cash collateral, and possibly compensated it for any losses it had suffered, the court stated "a secured creditor on notice may not choose to ignore unauthorized use of cash collateral until a chapter 11 case is converted and then seek to recover damages for all of the funds so misused"). Moreover, to the extent that the court in *Freightliner* shifted the burden of proof based upon notions of fairness, the *Cross Baking* decision suggests that such equitable considerations are unwarranted absent an initial showing that proceeds of pre-petition accounts receivable are in issue.

Except for the decisions in *Freightliner, Placid Oil,* and *Aerosmith Denton,* the last two of which did not even involve Chapter 7 trustees, Cargocaire has not cited any decisions that unequivocally favor the secured creditor which has failed to take timely steps to protect its interests over a Chapter 7 trustee. Indeed, some courts consider actions against corporate principals, rather than Chapter 7 trustees, for the misuse of cash collateral. For example, in *In re Koran Enterprises, Inc.,* 61 B.R. 321 (Bankr. W.D.Mo.1986), the court determined that the debtor and its managing officer were liable for conversion stemming from the diminution in value of proceeds of pre-petition accounts receivable used without court authority. Additionally, courts do not uniformly find that the appropriate remedy is the granting of a replacement lien. In *Etch–Art,* 48 B.R. at 146, the court determined that money damages, rather than a retroactive replacement lien, was the appropriate remedy for the unauthorized use of cash collateral.

As between the Chapter 7 Trustee and Cargocaire, which was in a position to protect its collateral during the course of the Chapter 11, the Court is not convinced that Cargocaire should be rewarded for its lack of diligence by shifting the burden to the Trustee to establish the extent of Cargocaire's lien. The Court agrees with the Trustee that there are material facts in dispute, and the burden rests upon Cargocaire to establish the validity and extent of its lien.

## V. CONCLUSION

In *Cross Baking,* the court did not unequivocally state that in the absence of consent a secured party would be entitled to a portion of the liquidated post-petition receivables. 818 F.2d at 1030 n. 5. Its comment that it was *arguable* that a secured party be granted an interest in post-petition accounts receivable suggests that the granting of a replacement lien should not be automatic. Accordingly, upon consideration of *Cross Baking* and the other cases discussed above, the Court denies Cargocaire's Motion for Judgment on the Pleadings.