**In re PLACID OIL COMPANY, Debtor.**

**No. 386–33419–A–11.**

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

Nov. 20, 1987.

R. Paul Wickes, Robert W. Jones, Thompson & Knight, Dallas, Tex., Kenneth R. Wynne, Bracewell & Patterson, Houston, Tex., for Placid Bank Group.

D. Michael Dalton, Hutcheson & Grundy, Houston, Tex., for Unsecured Creditors' Committee.

Henry W. Simon Jr., Simon, Anisman, Doby, Wilson & Skillern, Dallas, Tex., for debtor.

George F. McElreath, Dallas, Tex., Asst. U.S. trustee.

Grover Hartt, III, Dept. of Justice, Tax Div., Dallas, Tex., for U.S.

## MEMORANDUM OPINION REGARDING USE AND/OR MISUSE OF CASH COLLATERAL BY THE DEBTOR–IN–POSSESSION

HAROLD C. ABRAMSON, Bankruptcy Judge.

The issues before the Court arise out of several Motions and Hearings on the issues

of use and misuse of cash collateral by the Debtor-in-Possession ("Placid"). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (K), (M), (O). The following constitutes findings of fact and conclusions of law under Bankruptcy Rule 7052.

RepublicBank Dallas, N.A., for itself and as agent for the Placid Bank Group, and each Lender, have filed a "Motion of Placid Bank Group (1) To Prohibit Debtor From Using Cash Collateral and (2) To Compel Debtor to Segregate and Account for All Cash Collateral and to Provide Information Concerning Cash Collateral." The Motion first came on for a hearing before this Court on December 5, 1986, and the hearing continued on December 9, 17 and 23, 1986, and January 21, 1987. RepublicBank has also asserted that Placid has misused cash collateral with allegations that sanctions, replacement liens, or administrative expense priorities should be afforded the Banks for said misuse of cash collateral. Placid has disputed this position claiming that the Banks had failed in their burden of establishing their interests as perfected security interests, and in establishing that the funds involved were in fact and in law cash collateral.

At the hearing on December 5, 1986 documents were introduced in evidence by reference to exhibits which involved numerous documents containing numerous pages of agreements.

The Banks assert the following:

(A) RepublicBank Dallas, N.A. is agent for a number of secured lenders (the "Lenders") to the Debtor, Placid Oil Company, and to its subsidiaries.

(B) Placid has been and currently is engaged in various phases of the oil and gas business in and offshore of the United States and Canada. Placid Building and Service Company ("PBSC"), Placid Refining Company ("PRC"), Placid International Oil, Ltd. ("PIOL"), Crescent Investment Company ("Crescent"), and Placid Investment Company ("PIC") (collectively, the "Subsidiaries") are wholly owned subsidiaries of Placid. (Placid and the Subsidiaries are collectively referred to as the "Placid Entities").

(C) Prior to the commencement of this proceeding, the Placid Entities incurred indebtedness (the "Debt") to the Lenders under the following documents (the "Loan Documents"):

(i) Credit Agreement, dated as of June 1, 1983.

(ii) Ninety separate promissory notes (the "Notes"), which were made by each of the five Subsidiaries of Placid, to each of the 18 Lenders, providing for the payment of principal, interest and certain costs, fees and expenses.

(iii) A Guaranty, dated as of June 1, 1983, as amended, executed by Placid for the benefit of the Lenders, by which Placid guaranteed the Debt (the "Placid Guaranty").

(D) That the amount of principal and interest due by Placid to the Lenders pursuant to the terms of the Loan Documents, as of December 5, 1986, was as follows:

| | | |
|---|---|---|
| Principal | — | $773,301,338.04 |
| Interest | — | 53,887,332.03 |
| Total: | | $827,188,670.07 |

(E) In order to secure the Debt and the Placid Guaranty obligations, the Placid Entities granted or attempted to grant to Republic, as agent and for the benefit of the Lenders, and to the Lenders, certain mortgages, deeds of trust, security interests and assignments of proceeds in certain property of the Placid Entities, including the following:

(i) Placid's mineral lease interests in all its producing areas, including the Black Lake Field in Louisiana and offshore Louisiana blocks (primarily South Marsh Island and Eugene Island);

(ii) Proceeds from sale of oil and gas production from these mineral leases;

(iii) PIOL's interest in production from the Dutch North Sea (primarily L10 and K12 blocks) and PIOL's interest in the NGT pipeline;

(iv) Placid Refining Company's interest in the Port Allen Refinery and the Mt. Belvieu Plant;

(v) Gas processing plants;

(vi) Pipelines;

(vii) Revenues produced through operation of various other assets;

(viii) PBSC's interest in Thanksgiving Tower;

(ix) The capital stock of the Subsidiaries; and

(x) Other property being more particularly described in the Security Documents.

(F) RepublicBank claims to have filed the Security Documents and all financing statements necessary to perfect the interest in the Collateral in all appropriate federal, state, county, and parish recording offices.

(G) Most of Placid's income is derived from collateral properties.

(H) Placid filed its Chapter 11 proceeding on August 29, 1986 (the "Filing Date"). During the month immediately preceding the Filing Date, Placid's expenditures for "drilling and construction" on non-collateral properties, which customarily averaged $15 million to $17 million per month in 1986, totalled in excess of $47 million.

(I) On August 28, 1986, the day immediately preceding the Filing Date, and in anticipation of a filing, Placid expended approximately $27.5 million. Most if not all of the expenditures were made by wire transfers, which is not the usual way Placid made such payments. The $27.5 million expended included, among other things, the following:

(i) $13.75 million to Penrod Drilling Company, a partnership among the three stockholders of Placid.

(ii) $4.9 million to certain vendors on the "Green Canyon" project, a non-collateral property.

(iii) $1.5 million to Hunt Petroleum, Inc., owned in part by trust estates for siblings of the owners of Placid and Penrod.

(iv) $235,000 to Prosper Oil Company, owned in part by the owners of Placid.

(v) $120,000 to Petro Hunt, owned in part by the owners of Placid.

(J) In the ten days prior to the Filing Date, a total of $28.7 million was deposited in Placid's bank account.

(i) $7.8 million was Placid's share of direct revenues from the sale of oil and gas, on which the Lenders have a lien.

(ii) $3.7 million was reimbursement to Placid for funds advanced by Placid to pay certain expenses on behalf of Placid's joint working interest owners. The funds initially advanced by Placid were revenues from the sale of oil and gas on which the Lenders have a lien.

(iii) $2 million was reimbursement to Placid for funds advanced by Placid to pay certain expenses on behalf of Placid's subsidiaries and other affiliates. The funds initially advanced by Placid were revenues from the sale of oil and gas on which the Lenders have a lien.

(K) As of the Filing Date, Placid had on hand in its bank account approximately $14 million.

(L) Placid did not segregate as cash collateral any of the $14 million on hand in its bank account at the Filing Date.

(M) Portions of the post-petition receipts which Placid did not treat as cash collateral were derived from the following sources:

(i) $8.2 million was reimbursement to Placid for funds advanced by Placid to pay certain expenses on behalf of Placid's joint working interest owners. The funds advanced by Placid were revenues from the sale of oil and gas on which the Lenders have a lien.

(ii) $4.1 million was reimbursement to Placid for funds advanced by Placid to pay certain expenses on behalf of Placid's subsidiaries and other affiliates. The funds initially advanced by Placid were revenues from the sale of oil and gas on which the Lenders have a lien.

(iii) $2.1 million was cash received by Placid from its subsidiary, PRC, in September and October, 1986, ostensibly in repayment of Intercompany loans but in reality constituting a distribution in respect of

Placid's equity investment in PRC that the Security Documents provide that the Lenders' collateral includes all distributions in respect of the pledged PRC stock.

(N) Placid expended the $14 million cash on hand as of the Filing Date, and the above-described post-petition receipts of $8.2 million, $4.1 million, and $2.1 million, post-petition without Court approval and without consent of the Lenders.

Placid does not controvert all of these assertions by the Banks, but does assert the following:

(A) There was approximately $12.5 million in the Bank account at the date of the filing, August 29, 1986.

(B) The Placid Banks do not have a perfected interest in the Debtor's cash deposits.

(i) The Placid Banks have not met their burden of proof to show compliance with applicable law governing the creation and perfection of the asserted security interests.

(ii) The Placid Banks have not obtained liens upon the Debtor's Louisiana Mineral Leases.

(iii) Even if the Placid Banks' mortgages are proper, they have failed to perfect an interest in the proceeds under Louisiana law.

(iv) The Placid Banks have failed to perfect any security interest in proceeds under Texas law.

(v) The Banks have failed to perfect any interest in proceeds by seeking possession thereof.

(C) That under the terms of the Mortgage and Credit Agreement, the proceeds in the Debtor's hands are to be received free and clear of any encumbrance; that said agreement merely provided for the assignment of income proceeds as collateral.

(D) The Placid Banks' interest, if any, is adequately protected.

(E) That even if there was an unauthorized use of cash collateral, the Banks are either protected or the Court could provide adequate protection as a remedy.

Counsel for the Unsecured Creditors' Committee have joined Placid in substantially the same arguments.

The situation involves properties located in Louisiana and Texas, principally. The Banks have made references to documents and exhibits which consist of literally hundreds of pages in the Court files.

The crux of the Banks' position is that all proceeds of the oil and gas, all proceeds of proceeds of the oil and gas, and all proceeds of proceeds of proceeds of the oil and gas are subject to the Banks' security interests. For example, the Banks extend this argument to the income tax refund, which they claim is based upon the oil income and its proceeds; that, therefore, the refund is proceeds of proceeds of proceeds. Further, the Banks claim that the reimbursement by joint interest owners is proceeds of proceeds of oil and gas. The Banks claim that payments from Placid Refining to Placid were payments based upon the rights arising out of Placid's ownership of stock in Placid Refining. The Banks do not claim security interests by virtue of any perfected filing as to general intangibles or accounts receivable. These exercises by both sides are interesting intellectual exercises; however, as this Court sees the basic issues, the Credit Agreement is the starting point. Upon a review of that Credit Agreement, one encounters Article VI, Section 6.5:

*Proceeds of Runs.* Notwithstanding that, by the terms of the Mortgages, Placid is and will be assigning to Lenders all of the "rent", "proceeds of runs" and "Proceeds" (as defined in the Mortgages) and similar income from the Collateral covered thereby, so long as no Default or Event of Default has occurred Placid will be permitted to continue to receive from the purchasers of production all such rent, proceeds of runs, Proceeds and similar income; however, upon the occurrence of a Default or Event of Default Agent and Lenders may exercise all rights and remedies granted to them, including without limitation the right to receive directly from the payors thereof all such rent, proceeds of runs, Proceeds and similar income.

■ The burden of proof on the issues of the validity, priority, or extent of such interest in the cash collateral is on the Banks. 11 U.S.C. § 363(o)(2).[1]

■ As *Collier on Bankruptcy* states: As is the situation under section 362, the trustee has the burden of proof on the issue of adequate protection at any hearing under section 363 but there is no requirement that the entity seeking relief make a preliminary showing of cause. Subsection (o), added by the Bankruptcy Amendments and Federal Judgeship Act of 1984, expressly provides that the trustee has the burden of proof on the issue of adequate protection but that the entity asserting an interest in the property has the burden of proof on the issue of validity, priority, and extent of such interest. As is the case under section 362, the informal nature of the litigation will permit informal examination of lien validity but not extensive litigation of counterclaims.

2 Collier on Bankruptcy ¶ 363.06 at 363–29 (15th ed. 1987). This type of litigation is on a fast track, and upon informal examination of the Banks' lien claims, the Court finds that the Banks have valid and perfected liens on proceeds of oil and gas. *In re Mathis*, 64 B.R. 279 (N.D.Tex.1986). The Credit Agreement[2] prepared by the Banks clothes the Debtor with the power and right to use proceeds of oil and gas in its business until a "Default." Upon default, the Banks thereupon have the right to seek various remedies for accomplishing the cessation of the use thereof by Debtor, and consequent collection pursuant to the Agreement, and pursuant to legal remedies. Article IX, Section 9.6 states:

*Governing Law.* The Loan Documents shall be deemed contracts and instruments made under the laws of the State of Texas and shall be construed and enforced in accordance with and governed by the laws of the State of Texas and the laws of the United States of America, except (i) to the extent that the law of another jurisdiction is expressly elected in a Loan Document, and (ii) with respect to specific security interests or liens, or the perfection thereof, evidenced by Security Documents which by the laws applicable thereto are required to be construed under the laws of another jurisdiction. Obligors hereby irrevocably submit themselves and each other Company to the non-exclusive jurisdiciton of the state and federal courts of the State of Texas and agree and consent that service of process may be made upon any Company in any legal proceeding arising out of the Loan Documents and/or the Obligations by serving the Secretary of State of the State of Texas in accordance with any applicable provision of the Texas Revised Civil Statutes, as amended, governing service of process.

The Banks prepared the Credit Agreement so must they live by the Credit Agreement.[3]

---

1. The following provisions are also applicable to this discussion:

   Section 363(c)(2):
   The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
      (A) each entity that has an interest in such cash collateral consents; or
      (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.
   Section 363(c)(4):
   Except as provided in paragraph (2) of this subsection, the trustee shall segregate and account for any cash collateral in the trustee's possession, custody, or control.

   .    .    .    .    .

   (e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest.

   .    .    .    .    .

   (o) In any hearing under this section—
      (1) the trustee has the burden of proof on the issue of adequate protection; and
      (2) the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest.

2. Article VI, Section 6.5, *supra.*

3. The Banks did not discuss the impact of the Credit Agreement in their Briefs or Argument.

This case is strikingly similar to that of *Wolters Village v. Village Properties (In the Matter of Village Properties, Ltd.)* 723 F.2d 441 (5th Cir.1984), *cert. denied,* 466 U.S. 974, 104 S.Ct. 2350, 80 L.Ed.2d 823 (1984). In *Village Properties,* the Fifth Circuit Court of Appeals established that the starting point is state law for determination of property rights, citing *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

From the record in this case, all proceeds of funds from the sources available to the Debtor came to the Debtor, Placid Oil, under its control in various bank accounts. Placid's main office is in Dallas County, Texas. The parties have argued both Texas and Louisiana law applicability to the case at hand.

The Credit Agreement, Article IX, Section 9.6, says Texas law is to control. Also, the main office of Placid being in Dallas, Texas, and the center of control of funds also in Dallas, Texas, the case of *Taylor v. Brennan,* 621 S.W.2d 592, 594 (Tex.1981), cited in *Village Properties, supra.,* would be controlling. There, the Texas law was stated to the effect that:

> In *Taylor* the Supreme Court of Texas found that an assignment clause similar to the one in the case at bar manifested an intent by the parties to create a pledge of rentals. 621 S.W.2d at 595. Applying Texas law to the case before us we find that the assignment of rents in the deed of trust only created a security interest. Thus, if state law governs this issue (instead of the Bankruptcy Code) appellant is not entitled to the rents in dispute because it did not take affirmative steps to activate that pledge. For the appellant to prevail in this case Congress must have intended that the Bankruptcy Code preempt state law on the assignment of rents. In addition, the Code must provide that an assignment is automatically activated upon default.

.    .    .    .    .

It should be remembered that in *Taylor* the Texas Supreme Court held that an assignment of rentals becomes operative when the mortgagee "obtains possession of the property, or impounds the rents, or secures the appointment of a receiver, or takes some other similar action." 621 S.W.2d at 594 (emphasis added). The filing of such a petition required affirmative action which is equivalent to the spirit of the *Taylor v. Brennan* requirements. The form of the action required to perfect the mortgagee's interest is not as important as its substantive thrust— diligent action by the mortgagee which demonstrates that he would probably have obtained the rents had bankruptcy not intervened.

On the one hand, is the situation of the Banks and Placid herein analogous to the assignment of rentals situation in *Village Properties?* If so, then perfection by filing is not the issue here; the issue is whether and when did the Banks take some sequestrative action to perfect the liens on proceeds of oil and gas. On the other hand is the situation at hand one wherein the Banks are already perfected as to the collateral so as to have an "interest" defined in Section 363 because of having filed and perfected (for the purpose of this hearing) real estate liens, and U.C.C. (or equivalent) filings on proceeds of oil and gas (personalty)?

In Texas proceeds of oil and gas after severance is personalty. 55 Tex.Jur.3d § 8, pages 29–30. Uniform Commercial Code Section 9.102(a)(1) says the U.C.C. applies to any transaction intended to create a security interest in personalty. Section 9.302(1) requires the filing of a U.C.C. to perfect the security interest as to third parties. Section 9.401(a)(2) defines the place to file for perfection. In *Village Properties* and *Casbeer,* 793 F.2d 1436 (5th Cir.1986), the real estate mortgagee had an inchoate right that required *perfection* by "sequestrative action" under state law. The situation of the Placid Banks is a specific security interest in *personalty* proceeds of oil and gas, perfected, with definitive rights attached thereto. Under established personal property security transactional law no further perfection was needed —even a bona fide purchaser could not cut off the bank rights. The Court concludes

at this juncture that *Village Property* and *Casbeer* would not be applicable to the situation in this case. Those cases are confined to real estate mortgages. *See In re First City Mortgage Co.*, 69 B.R. 765 (Bankr.N.D.Tex.1986).

However, one must consider various conflicting issues in the situation at hand:

1) Having concluded that the Banks were perfected in the proceeds of oil and gas, how does one factor in the right and privilege conveyed by the Banks to Placid in the Credit Agreement Article VI, Section 6.5?

2) If Placid had the right and privilege of utilizing those funds until a "default"— was there an occurrence of a default or event of default?

3) If there were a default, did that cause a cessation of the right and privilege of Placid to utilize the funds, the proceeds of oil and gas?

4) When does Section 363(c)(2) become operative?

By way of answer, this Court holds that considering the totality of events preceding the filing of this Chapter 11 proceeding, involving: (a) the actions of the Banks to foreclose the properties, (b) the filing of injunctive proceedings by Placid (et. al.), (c) the counter-actions of the Banks thereto—amounted to sufficient notice of "Default" to cause cessation of Placid's right to use proceeds. At a minimum this required the Debtor to segregate the proceeds of oil and gas in the amount of $7.8 million on deposit on the date of bankruptcy. This segregation was required by 11 U.S.C. § 363(c)(2) and (4), on the date of filing the petition. Tracing the $7.8 million proceeds of oil and gas into Placid's bank account is not seriously controverted. The Court finds that the Banks failed to sustain their burden of proof on the existence, validity, and perfection of security interests in the other categories of funds *prepetition* and on *date of petition*, and they are found to be other than cash collateral funds.[4]

In considering a proper remedy for the above defined misuse of cash collateral, the Court has looked to the case of *In re Aerosmith Denton Corp.*, 36 B.R. 116 (Bankr.N.D.Tex.1983).

The remedy found by this Court as appropriate in this case is as follows:

A) Pending further review by this Court in the event of successful contest of the Banks' validity and perfection of liens as to proceeds, the Placid Banks are hereby granted a lien on all right and title of Placid Oil Company in the leases or licenses in the so-called Green Canyon package of property rights held by Placid, plus *net* proceeds of production thereon to which Placid is entitled, until the Banks receive the sum of $7.8 million plus interest at six percent from August 29, 1986 until paid;

B) Henceforth, Placid shall not expend any of the impounded non-collateral funds from pension reverter or sale of gold mine property, and the interest thereon accumulated, without further order of this Court; this impoundment will be subject to periodic review by the Court with a view to replacement of any loss by Placid Banks due to misuse of cash collateral.[5] In this connection, the Court may resort to the provisions of 11 U.S.C. § 552(b) involving the equities of the case.

Mr. Wickes, counsel for Placid Banks, is requested to prepare findings of fact and appropriate order hereon.

---

**4.** These categories are:
    1) Reimbursement of joint interest owners.
    2) Reimbursement for funds advanced by Placid to pay expenses of subsidiaries and affiliates.
    3) $2,100,000 received from Placid Refining Co.

**5.** At the date of the filing of the Petition, Placid was represented by counsel other than counsel now serving the Debtor-in-Possession. The Court's findings herein regarding funds spent by Placid post-petition are not to be considered as in any way condoning the conduct of Placid or said counsel. Nor are the expenditures prepetition regarded by the Court as being in the ultimate interest of Placid (or its unsecured creditors) in its hope to formulate a Plan.