In re **FOUR SEASONS MARINE & CYCLE, INC.**, Debtor.

No. 99–61315.

United States Bankruptcy Court,
E.D. Texas,
Tyler Division.

June 1, 2001.

John D. Penn, Scott W. Everett, Haynes & Boone, LLP, Fort Worth, TX, for Deutsche Financial Services Corp.

Thomas G. Overbeck, Brill & Johnson, PLLC, Houston, TX, for Stanley L. Swanson.

Jason R. Searcy, Jason R. Searcy, P.C., Longview, TX, for Jason R. Searcy, Chapter 7 Trustee.

### MEMORANDUM OF DECISION

BILL G. PARKER, Bankruptcy Judge.

This matter came before the Court for hearing and determination of the "Motion for an Accounting, Adequate Protection, Payment of Post–Petition Claims, and to Show Cause" (the "Motion") filed by Deutsche Financial Services Corporation ("DFS"). Following a rather circuitous route, the sole issue remaining for the Court to consider is whether DFS should be awarded a replacement lien, a priority administrative claim, or a judgment imposing personal liability against the Debtor's two principal officers, or any or all of the above, arising from its assertion that Four Seasons Marine & Cycle, Inc., in its capacity as a Debtor–in–Possession, failed to

segregate and to account for certain funds constituting the cash collateral of DFS. This memorandum of decision disposes of all issues pending before the Court.[1]

## Background

On June 24, 1999, Four Seasons Marine and Cycle, Inc. (the "Debtor" or "Debtor-in–Possession") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Among its secured creditors was DFS which asserted a secured claim of approximately $2,274,626.54 arising from "floor plan" financing which it provided to the Debtor prior to and following the filing of the bankruptcy case. To secure the payment of its claim, DFS asserted a comprehensive and properly perfected security interest in virtually all of the Debtor's assets, including its inventory and equipment.[2]

On June 29, 1999, five days after the bankruptcy filing, DFS filed a motion to prohibit the Debtor's continued use of cash collateral. In that motion, DFS asserted that, in the pre-petition period, the Debtor had sold DFS collateral valued at $221,400.00 for which no sale proceeds had been forwarded to DFS. Upon request by DFS filed on July 7, 1999, the Court scheduled an emergency hearing on DFS' motion which was conducted two days later on July 9, 1999.[3]

On the date of the preliminary hearing, DFS, the Debtor, and another secured creditor, Transamerica Commercial Finance Corporation ("Transamerica"), announced an interim agreement for the

Debtor's use of cash collateral pending the final hearing which the Court scheduled for July 23, 1999. This interim agreement was later reduced to writing and entered on July 17, 1999. Under the interim cash collateral order, the Debtor acknowledged that it had existing account balances totaling approximately $137,000.00 which it represented to be all of the sale proceeds of DFS and Transamerica inventory received by the Debtor from June 24, 1999 to July 9, 1999. The parties agreed that the Debtor would immediately tender $76,000.00 to DFS and $34,000.00 to Transamerica and that it would thereafter provide to each secured party a daily list of sales of inventory. The Debtor further agreed to open separate deposit accounts in which it would place the proceeds arising from the sale of DFS and Transamerica inventory. The interim order allowed the Debtor to utilize the remaining sums only to pay ordinary operating expenses of its business.

During the interim period, DFS discovered that additional assets constituting its collateral had been sold out of trust and, in response to those allegations, the Court issued a *sua sponte* order on July 20, 1999 setting an emergency hearing for July 23rd, in conjunction with the final cash collateral hearing, for the Debtor to show cause as to why a Chapter 11 trustee should not be appointed. The Debtor consented at that show cause hearing to the appointment of a Chapter 11 trustee. The trustee appointment was immediately accomplished and, with the consent of all of the affected secured parties, the Court

---

1. This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a). The Court has the authority to enter a final order in this contested matter since it constitutes a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(A), (B)(M), and (O).

2. Within five days of the bankruptcy filing, DFS filed a notice of the continuation of its security interests as required under § 552(b) of the Bankruptcy Code.

3. Only upon the date of hearing did the Debtor finally file a motion for authority to use cash collateral.

continued the final hearing regarding cash collateral to August 12, 1999 in order to allow the trustee to ascertain the scope of the bankruptcy estate and to determine whether, in his opinion, reorganization of the entity was still a feasible option. The trustee ultimately answered that question in the negative. Thus, on August 12th, the Court granted relief from the automatic stay to both DFS and Transamerica, thereby rendering moot the remaining cash collateral issues, and, approximately two weeks later, the Chapter 11 trustee converted the case to Chapter 7.

DFS subsequently filed the present motion. After a delay engendered by an unsuccessful attempt by Stanley Swanson, the former president of the debtor corporation, to disqualify DFS' counsel, which was denied by this Court following hearing, the Court conducted an extended evidentiary hearing on DFS' motion. During the hearing, some, but not all, of the discrepancies regarding the disposition of sale proceeds of DFS' collateral were explained. At the conclusion of that hearing, the Court issued certain oral findings and, based upon those findings, entered an interim order on February 24, 2000 (the "Interim Order") which addressed, among other things, the need for further investigation and explanation by the Debtor and its principals regarding the apparent dissipation of DFS' cash collateral in the time period immediately preceding and following the filing of the Debtor's voluntary Chapter 11 petition.[4] Specifically, the Interim Order required the debtor corporation, through its corporate representatives, to provide an accounting on or before April 24, 2000 regarding the disposition of assets arising from four (4) particular transactions:

| | Invoice# | Unit# | Mfg. | Product | Model# | Serial# |
|---|---|---|---|---|---|---|
| 1. | 174093–18 | 063506–1 | Four WI | Boat | 214 Candia | FWNCX016H899 |
| 2. | 14879 | 062839–8 | TritLP | Boat | TR180DC | ZE8129G899 |
| | 14879 | 062839–9 | TritLP | Boat engine | 150L XR6 | OG815262 |
| 3. | 52321–12 | 057692–5 | Lowe | Boat engine | J50TSLEC | 4444501 |
| | 58049–31 | 060060–3 | Lowe | Boat | L215EC | L825PJ |
| | 58049–31 | 060060–4 | Lowe | Boat trailer | B2021EC | 002782 |
| 4. | 176747–13 | 064534–8 | Four WI | Boat | 170H | MA175J899 |

The Interim Order further provided that DFS or the Chapter 7 Trustee could file a response to the accounting within 10 days of its filing and that the Court's consideration of the remaining requests for relief asserted by DFS would be continued to a future date.

On April 24, 2000, the Debtor corporation, in compliance with the Interim Order, filed a "Debtor's Accounting Report" re-

---

**4.** Included was a finding that DFS had failed to demonstrate, by a preponderance of the evidence, that the attorney for the Debtor–in–Possession should be sanctioned for allowing or advising the Debtor to use DFS' cash collateral. As the Court noted, however, the attorney's actions in the case could persuade a person that he was not competent to handle a Chapter 11 case, but that those issues could be more properly handled through the Court's consideration of the attorney's fee application.

garding the sale of the seven assets in the four sales transactions referenced by the Court.[5] Though considerable paperwork was attached as exhibits, the accounting actually offered little in terms of definitively determining the Debtor's actions with regard to DFS' cash collateral. Most of the Debtor's conclusions were deliberately ambiguous—couched in equivocal terms such as "apparently," "it is believed," or "it is possible." While the Debtor did acknowledge that the proceeds from sale # 1 were mistakenly forwarded to Yamaha Motor Corporation, the Debtor concluded that the sales proceeds due and owing to DFS arising from the remaining three transactions were "apparently" forwarded to Transamerica. The Court is aware of no action by the Debtor nor by the Trustee to confirm or to recover any such misapplication of funds.

■ Notwithstanding its vagueness, no party, including DFS, filed any response to the Debtor's accounting. Thus, from the Court's perspective, there was no challenge to the assertions made by the Debtor in the accounting, and the Court interpreted that lack of response as an indication that all issues had been explained to the satisfaction of the parties or otherwise resolved. That such a conclusion was, in fact, a misconception on the Court's part was revealed when DFS, in October, 2000, requested a telephonic status conference regarding the status of its

cash collateral motion. In response thereto, the Court entered an order directing DFS to present a written submission containing its specific responses to the Debtor's accounting and, based upon those responses, to articulate the remaining relief which it sought to obtain. DFS filed that written response on January 29, 2001 and again requested the Court to grant to DFS

> ... a replacement lien on unencumbered assets, a superpriority administrative claim, and judgments holding both Stanley Swanson and Curtis Swanson individually liable for the intentional and flagrant abuse of DFS' cash collateral.[6]

Although Stanley Swanson and the Chapter 7 Trustee were notified and authorized by the Court to do so, no party filed any objection or other response to the written submission of DFS. Thus, under such circumstances, the issue is presented to the Court for consideration.

### Discussion

■ The Bankruptcy Code could not be more explicit as to the duty imposed upon a debtor-in-possession to account for a creditor's cash collateral.[7] A debtor-in-possession is absolutely prohibited from using cash collateral unless it obtains the consent of the affected secured creditor or an authorization from the bankruptcy court.[8] In the absence of such consent or

---

**5.** With the exception of sale # 1 which occurred on or about June 5, 1999 but wasn't funded until June 23 or 24, all of the transactions occurred in the post-petition period (after June 24, 1999).

**6.** Though DFS' post-submission brief and its response to the Debtor's accounting asks for relief against Curtis Swanson, the Court will not consider such requests since the evidentiary hearings were conducted on DFS' original motion which did not request any relief against Curtis Swanson.

**7.** Though the text of the Bankruptcy Code references only the use of cash collateral by a trustee, a debtor-in-possession in a chapter 11 case is, of course, authorized to exercise most trustee functions and duties, including those existing under § 363 of the Code. *See* 11 U.S.C. § 1107(a).

**8.** § 363(c)(2) of the Bankruptcy Code states that:

> [T]he trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—

authorization, a debtor-in-possession is under an absolute obligation to segregate and to account for all such cash collateral.[9] These principles are not subject to dispute.

Neither is there any dispute in this case that Four Seasons Marine & Cycle, Inc. ignored those basic principles. It wholly failed to segregate or to account for the sales proceeds arising from the sale of DFS collateral. Though its actual use of those funds has not been clearly established, Four Seasons certainly did not obtain the consent of DFS for the use of cash collateral, nor did it obtain court authorization for any proposed use of those funds.

The misuse of DFS' cash collateral has been established. But what is the most appropriate remedy for that misuse? Surprisingly, there is no explicit statutory remedy for such a defalcation. To fill that vacuum, courts have employed a number of devices designed to achieve restitution for the affected creditor, as well as to create an effective incentive for a debtor-in-possession, as well as for debtors-in-possession in future cases, to take affirmative action to insure compliance with the cash collateral restrictions imposed by the Code. These have included the imposition of a replacement lien upon other unencumbered property of the estate; the repayment of the converted funds by the debtor or the debtor's principals; the grant of a superpriority administrative expense; the entry of a judgment declaring the debt arising from the defalcation to be non-dischargeable; the entry of a conversion judgment for money damages; the granting of stay relief; the appointment of an examiner; the appointment of a Chapter 11 trustee; or the conversion of the case to Chapter 7. *See,* Harley J. Goldstein & Craig A. Sloane, *Spending Other People's Money: Creditors' Remedies for the Misuse of Cash Collateral in Bankruptcy,* 7 U. Miami Bus. L.Rev. 243 (1999) and cases cited therein.

In this case the debtor-in-possession's misuse of cash collateral quickly led to the invocation of a number of the referenced sanctions. At the first sign of abuse, the court's *sua sponte* order resulted in the prompt removal of the debtor from its debtor-in-possession status and the appointment of a chapter 11 trustee. DFS was granted stay relief so that it might foreclose its security interests in remaining collateral. Finally, following the Chapter 11 trustee's initial investigations, the case was quickly converted to a Chapter 7 liquidation.

However, none of the above sanctions are designed to fulfill DFS' legitimate desire for restitution. As might be expected, DFS seeks a recovery from all available sources. As against the bankruptcy estate, DFS seeks to impose a replacement lien on all unencumbered assets,[10] as well as the granting of a super-priority administrative expense against the estate for all amounts remaining unpaid after it realizes the value of its replacement lien. It further seeks, pursuant to § 105(a) of the

---

(A) each entity that has an interest in such cash collateral consents;
or
(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

9. 11 U.S.C. § 363(c)(4) explicitly provides that, in the absence of consent or court authorization,

"... the trustee shall segregate and account for any cash collateral in the trustee's possession, custody, or control."

10. DFS alleges that the estate has unencumbered credit card receipts as well as at least three unencumbered vehicles.

Bankruptcy Code,[11] the entry of an order holding Stanley Swanson, the president of the debtor corporation, personally liable for the missing sums.[12] In seeking such relief, DFS relies primarily upon the decision in *Mercantile National Bank at Dallas v. Aerosmith Denton Corp. (In re Aerosmith Denton Corp.)*, 36 B.R. 116 (Bankr.N.D.Tex.1983) in which the bankruptcy court relied upon § 105(a) to grant to a creditor in DFS' position relief against the bankruptcy estate in the form of a replacement lien and a priority administrative claim, and it further gave credence to the concept of assessing sanctions against those individual parties responsible for a misuse of cash collateral after the commencement of a Title 11 case, although it ultimately refused to do so because a different judge had presided over the early stages of that case.

The motivation expressed by Judge Brister in *Aerosmith Denton* to enforce the cash collateral restrictions imposed by the Bankruptcy Code should be compelling to any bankruptcy court. In rejecting the debtor's argument that there were no available sanctions which could be assessed against a debtor who violated the Code's cash collateral restrictions, he noted that

> ... the continuation of lending transactions between the business community on the one hand and lending institutions on the other require that liens negotiated in good faith and for which full consideration has been given must be protected. Adoption of [the debtor's "no penalty" theory], so that a valid lien of a creditor is recognized by the Court but both the Court and the creditor are powerless to preserve and protect that

lien after bankruptcy has been initiated, will result in anarchy. That cannot be the result intended by Congress. Therefore I have interpreted § 105(a) of the Code as giving to the Court the power and the duty to do those things which are reasonably required to protect the Court's jurisdiction and to carry out the intent of Title 11.... [Thus], the law should now be settled in this court— proper sanctions can be imposed *against those responsible* for use of cash collateral after a Title 11 case has been filed when there has been no compliance with § 363(c)(2).

36 B.R. at 119–20 (emphasis added). Several courts have endorsed this interpretation. *Midwest Properties No. Two v. Big Hill Inv. Co.*, 93 B.R. 357, 362 (N.D.Tex. 1988); *In re AG Service Centers, L.C.*, 239 B.R. 545, 552 (Bankr.W.D.Mo.1999); *In re Mr. Gatti's, Inc.*, 164 B.R. 929, 942 (Bankr.W.D.Tex.1994)[recognizing that, in the context of enforcing the debtor's obligations under § 365(d)(3), § 105 "allows the court to fashion an appropriate remedy where the Code is silent"]; *In re Placid Oil Co.*, 80 B.R. 824, 831 (Bankr.N.D.Tex. 1987); *In re Etch–Art, Inc.*, 48 B.R. 143, 146 (Bankr.D.R.I.1985); *but see* unpublished opinion in *Kelvin v. Avon Printing Co. Inc.*, 72 F.3d 129 (table disposition), available at 1995 WL 734481 (6th Cir. 1995).

■ While this Court wholeheartedly agrees with Judge Brister's recognition that a bankruptcy court has the power, as well as the duty, to act to rectify a debtor's misuse of cash collateral, the efficacy of any particular remedy to accomplish that restoration must be influenced by the current posture of the case. Is the noncom-

---

**11.** 11 U.S.C. § 105(a) provides, in relevant part, that a bankruptcy court "... may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

**12.** *See supra*, note 6.

pliant debtor still in existence or is it now being liquidated? Can restitution to the affected creditor be accomplished through a diversion of cash flow from the debtor's future business operations or any ultimate reorganization or does the estate contain only a finite amount of assets from which to draw? These considerations are directly relevant to the one fundamental question which must be answered in this case: who *should* restore the funds to DFS which were misappropriated by the Debtor-in-Possession?

■ This case is now a liquidation proceeding under Chapter 7—as a direct result of the Debtor's wrongful acts. There is no further punishment which can be inflicted upon this debtor-in-possession as an existing entity. There will be no rehabilitation of its business. It is dead, and those creditors without collateral may look solely to a limited pool of assets for the satisfaction of their outstanding claims. A trustee has been appointed and he has rendered substantial services to date for which he is justly expecting compensation. In this environment, to grant DFS a replacement lien upon all of the unencumbered assets of this bankruptcy estate, or to award DFS an administrative expense with priority over all other administrative claimants, punishes the wrong parties. While the imposition of such remedies would obviously restore certain funds to DFS, it would do nothing to discourage debtors-in-possession from engaging in this type of misconduct, and it would impose the burden for such restitution upon parties who are wholly innocent of any wrongdoing. In the first few days of this bankruptcy case when the misconduct involving DFS' cash collateral occurred, the trustee was obviously not yet appointed, and the unsecured creditors of this estate had no reason even to know of DFS' security position, nor did they possess the knowledge necessary to have prevented the misapplication of cash collateral. Un-

doubtedly DFS has suffered an injury here; however, "two wrongs do not make a right." The misappropriation of one creditor's property cannot serve as a proper justification for the redistribution of unrelated assets to the detriment of innocent parties. *See, e.g., Cargocaire Eng'g Corp. v. Dwyer (In re Gemel Int'l, Inc.),* 190 B.R. 4, 10 (Bankr.D.Mass.1995)[rejecting the idea that the conversion of proceeds of pre-petition collateral "is a misdeed for which a Chapter 7 trustee automatically must be held accountable without a consideration of all the facts and circumstances, or for which property of the estate, otherwise available for the benefit of unsecured creditors, automatically should be encumbered."]. To punish unsecured creditors and unsuspecting administrative claimants in a liquidation case for the sins of a former debtor-in-possession through the imposition of a replacement lien or a priority administrative expense claim seems fundamentally unfair, and this Court declines to impose such penalties to the detriment of blameless parties.

■ So to whom should DFS properly look for restitution? This Court believes that, under appropriate circumstances, but particularly in a liquidation context such as this, a secured creditor damaged by the misuse of its cash collateral by a debtor corporation, acting in a debtor-in-possession capacity, may properly look to the officers of the defunct debtor corporation for satisfaction of that claim, and that the authority granted to a bankruptcy court under § 105(a) of the Code to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title" authorizes this court to enforce the cash collateral restrictions of the Code by issuing a monetary assessment against those former corporate officers.

Mr. Swanson suggests that the imposition of personal liability against him would

be improper. However, as the Court noted in its oral findings, Mr. Swanson has never seemed particularly concerned nor interested in tracing the missing funds. He simply denies that he authorized any diversion of DFS funds or that he had any other involvement with this defalcation. He has, simply stated, pled ignorance. He has argued that the day-to-day accounting functions were outside the scope of his supervisory duties. He acknowledges that the parties truly responsible for this misconduct obviously worked somewhere in the debtor's organization, but denies any responsibility for that misconduct. Certainly no "smoking gun" was introduced by DFS through which these convenient denials of culpability by Mr. Swanson can be easily nullified.

▉ However, the acts and/or the omissions of a corporation occur only through the acts or omissions of officers who assume responsibility for managing the day-to-day affairs of that corporation and, once a corporation elects to seek relief under the Bankruptcy Code and it assumes the mantle of a debtor-in-possession with all of the duties attendant to that capacity, including the duty to segregate and account for a creditor's cash collateral, it is incumbent upon the officers of that debtor corporation to assume responsibility for the recognition and fulfillment of all statutory duties imposed by the Bankruptcy Code. Courts should not be responsible for supplying an incentive for corporate officers of a debtor-in-possession to invoke the concept of "plausible deniability." If corporate officers cannot be held responsible for the acts or omissions of a corporate debtor-in-possession, then there are no responsible parties, and there exists no incentive whatsoever for corporate officers to insure that the absolute and unequivocal duties and prohibitions imposed by Title 11 are observed.[13] They are the only persons who can do so. They should be held accountable when they do not.

Nevertheless, despite believing that § 105(a) can be used under appropriate circumstances to assess sanctions against corporate officers when their failure to insure compliance with cash collateral requirements causes damage to a secured creditor, the Court concludes that the imposition of such sanctions against the designated corporate officers is not required in this particular case because DFS has an adequate alternative remedy. The sums for which DFS seeks to make Mr. Swanson personally liable due to his inadequate supervision of the Debtor–in–Possession, have been or could be sought by DFS in its pending state court lawsuit against Mr. Swanson. Since DFS can obtain adequate monetary redress for the debtor's misconduct in its state court lawsuit, no purpose would be served by the assessment of additional sanctions by this Court. By pursuing the recovery of these sums against Mr. Swanson through its state court suit, DFS will benefit from the ongoing resolutions of its Four Seasons accounts—a problem obviously resident in its evidentiary presentation before this Court—and it also avoids an unnecessary debate over this Court's conclusion regarding its authority to impose sanctions upon corporate officers in this context. Thus, by proceeding against Mr. Swanson in state court, DFS evades the assertion of possible de-

---

13. Thus, while not reaching the heights of strict liability nor ignoring the possibility that a compelling defense could be presented, it is difficult to accept that the imposition of liability upon corporate officers as a sanction for a "corporate" defalcation of the duties imposed by Title 11 should require the demonstration of a heightened mental state such as "... knowingly ... willfully ... or contumaciously," and this Court has considerable doubts as to whether "good faith ignorance" could constitute a compelling defense. Cf. In re Aerosmith Denton Corp., 36 B.R. at 119.

fenses or arguments by Mr. Swanson to escape a liability which he should rightfully bear, while still assuring that he will be required to account for his failure to insure the debtor corporation's compliance with statutory cash collateral requirements imposed by the Bankruptcy Code.

Accordingly, all further relief requested by Deutsche Financial Services Corporation in its Motion for an Accounting, Adequate Protection, Payment of Post Petition Claims, and to Show Cause which has not been previously awarded by this Court is hereby denied. This memorandum of decision constitutes the Court's findings of fact and conclusions of law [14] pursuant to Fed.R.Civ.P. 52, as incorporated into contested matters in bankruptcy cases by Fed. R. Bankr.P. 7052 and 9014. An appropriate order will be entered which is consistent with this opinion.

14. To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The Court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.